**In re MUREL HOLDING CORPORATION.**

**In re ABMAR HOLDING CORPORATION.**

**METROPOLITAN LIFE INS. CO. et al. v. MUREL HOLDING CORPORATION et al.**

**Nos. 314, 315.**

Circuit Court of Appeals, Second Circuit.

March 11, 1935.

Tanner, Sillcocks & Friend, of New York City (Henry Sillcocks, of New York City, of counsel), for appellant Metropolitan Life Ins. Co.

Leon Leighton, of New York City, pro se.

Goldberg & Levitt, of New York City (Harry Goldberg and Arthur Levitt, both of New York City, of counsel), for appellees.

Max E. Sanders, of New York City, for trustee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from an order in bankruptcy denying a motion to vacate a stay of the prosecution of a suit in foreclosure in the state court; it arises upon the following facts: The Metropolitan Life Insurance Company held a mortgage upon an apartment house in the borough of Manhattan amounting to $400,500, owned as cotenants by the two corporations which are the petitioners herein. There was a second mortgage upon the same property, but for the purposes of this case it may be disregarded, for it was executed between the present co-owners and a company which holds all their stock. The mortgage being in default, the mortgagee filed a bill of foreclosure in the Supreme Court of New York on December 8th, 1934, and Leighton was appointed receiver of the rents. Immediately thereafter the owners filed petitions under section 77B of the Bankruptcy Act (11 USCA § 207), and procured an ex parte stay against the foreclosure. The mortgagee and the receiver moved to vacate this on December 19th, 1934, and the judge denied their motion on January 16th,

1935. They appeal from this order. When the bill was filed the defaults on the mortgage amounted to nearly $100,000; about $20,000 of taxes and assessments, $43,000 of interest and $36,000 of amortization payments. The properties were assessed at $540,000, and the rentals came to $3,600 a month. On December 26, 1934, the debtors filed with the court a "plan of reorganization" under subdivision (a) of section 77B, 11 USCA § 207 (a), by which the second mortgagee was to provide $11,000, to be used by the debtors to alter the "line C" apartments in the building; this advance to have priority over all liens but the arrears of taxes and such new taxes as fell due during the nine months that the alterations were in progress. The debtors estimated that during this period there would be a slight deficit in interest and taxes, but that thereafter the "line C" apartments would be much more readily leasable. The expected rentals should then come to $59,346 and the expenses would be only $20,400, leaving a yearly surplus of $38,946. Against this there would be taxes of $14,280 and interest of $22,027.50, leaving a surplus of $2638.50; enough to discharge existing arrears of taxes and leave about $3,000 at the end of ten years. In consideration of these expected benefits the mortgagee was to release the amortization payments ($9,000 per annum) and extend the due date; it was to receive its interest, 5½%, and all taxes were to be paid, both those in arrears and those to accrue. The mortgagee refused to consider this plan.

The argument and the briefs have taken a wide range, being for the most part directed to the powers of the court. We do not find it necessary to discuss the points raised, because it seems to us that though for argument we assume that the judge had power to grant the stay, there was not enough before him to justify one. The debtors' assumption is that under section 77B not only may a company effect a reorganization among its creditors, when two-thirds of each class consent, but that it may compel its unwilling creditors to accept a moratorium, though some of the classes refuse in toto. That was perhaps intended in subdivision (b) (5), 11 USCA § 207 (b) (5), but the power if it exists at all, is much hedged about. Normally it was expected that consents should be obtained. If they were not, the plan must "provide adequate protection for the realization by them," the dissenting class, "of the full value of their interest, claims, or liens". This may be done in four ways: (a) The liens may be merely kept in statu quo, the reorganization not going so deep down into the title, so to say, but being confined to the equity. That is not this case. (b) The property may be sold free and clear and the liens attach to the proceeds. This was a not uncommon course in bankruptcy when the court was in possession. Regardless of whether it may now apply to a case where it is not, nothing of the sort is here proposed. (c) The value of the liens may be appraised and paid, or, if the objectors prefer, the same course might be taken with any new securities which shall be offered to them in reorganization. This again was not adopted here. (d) The last is not, properly speaking, a "method" at all; it merely gives power generally to the judge "equitably and fairly" to "provide such protection," that is, "adequate protection," when the other methods are not chosen. It is this alone which the debtors here invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

If therefore subdivision (c) (10), 11 USCA § 207 (c) (10), may be applied to a situation like this, the stay so authorized, like any other, lies in the court's discretion; prima facie the creditor may go on to collect; if his hand is to be held up, the debtor must make a clear showing. The liens of the taxes and the first mortgage now are nearly $500,000 and the property is assessed for only $540,000; it has not been able to pay its way for several years. The amount to be advanced is a mere trifle compared with the debts; its effect is wholly speculative, based upon the expectations of those who have everything to gain and nothing to lose. The mortgagee is to be compelled to forego all amortization pay-

ments for ten years and take its chances as to the fate of its lien at the end of that period, though it is now secured by a margin of only ten per cent. It does not seem to us that this setting authorized any stay; it should appear that the plan proposed has better hope of success; full details may not be necessary, but there must be some reasonable assurance that a suitable substitute will be offered. No doubt less will be required to hold up the suit for a short time until the debtor shall have a chance to prepare; much depends upon how long he has had already, and upon how much more he demands. But a stay should never be the automatic result of the petition itself, and we cannot see that there was here anything else of substance.

Order reversed.