**In re Frederick Eugene CAGE and Demarsenses Lashell Cage.**

**No. 04–39752–H2–13.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 15, 2004.

Reese W. Baker, Baker and Associates, Houston, TX, for Frederick Eugene Cage and Demarsenses Lashell Cage.

***ORDER REQUIRING PERIODIC PAYMENTS AS CONDITION FOR CONTINUATION OF AUTOMATIC STAY (doc # 5)***

WESLEY W. STEEN, Bankruptcy Judge.

In their chapter 13 plan in this bankruptcy case, the Debtors seek (among other things) to pay the balance due on a claim secured by their automobile. Because the Debtors have made no payments to the secured lender since the case was filed in July, because the evidence showed that there is no equity cushion, and because the vehicle would depreciate significantly before payments under the plan would provide protection for the creditor, the Court orders (as a condition of continuation of the automatic stay) that the Debt-

ors must make interim payments to the secured lender to protect against the decline in value that will result from imposition of the automatic stay.

## FACTS

*The following facts are undisputed:* [1]

Frederick and Demarsenses Cage ("the Debtors") filed this chapter 13 case on July 9, 2004. On that date, the Debtors' vehicle (a 1998 Ford Expedition) was worth $6,994.45. The Debtors have no equity in the vehicle.

McGinnis Finance Co. ("McGinnis") holds a first security interest in the vehicle.

The Debtors have proposed a chapter 13 plan that provides for retention of the vehicle and payment of its value, as of the petition date, plus interest a 6.25%. Under the plan proposed by the Debtors, distributions to McGinnis would begin in the 9th month and would conclude in the 54th month.

The Debtors have made no payment to McGinnis and propose to make no payments to McGinnis until at least 9 months after the case was filed.

*The Court makes the following findings of fact after hearing:*

From the time the Debtors purchased the vehicle (January 2003) until McGinnis repossessed the vehicle (July 2004), the Debtors had driven it 41,000 miles, averaging about 2,300 miles per month.

Larry Rosamond, McGinnis' representative, testified that he had 25 years experience in the used car business and that it was his opinion that in 10 months the car would be worth between $4,500 and $5,000. Using a $6,994.45 starting value and Mr. Rosamond's $5,000 estimated value in 10 months, one would calculate that the vehicle depreciates about $200 per month. Mr. Rosamond also testified that the remaining life of the vehicle is about 24–30 months. The Debtors' exhibits 1–4 indicate a depreciation rate of about $165 per month. The Court finds that the depreciation of the vehicle is $175 per month.[2]

The Debtors testified, and the Court finds, that the Debtors' other two vehicles are not in working condition and that the Debtors must retain this vehicle in order to have a successful chapter 13 plan.

If the Debtors' proposed stream of payments to McGinnis is approved, McGinnis will not get its first payment until about April, 2005. At that time the collateral will be worth about $1,575 less than it was worth when the case was filed.[3] The collateral will become worthless about 2 years before the secured claim is paid off.[4]

---

1. From the docket sheet in this case, including docket # 19, hereafter "Joint Pretrial Statement," paragraph 5.

2. The Court picked the lower end of the depreciation evidence despite the testimony that the Debtors put more mileage on the car than average.

3. $175*9=$1,575.

4. According to the testimony, the car becomes worthless in less than 30 months. The plan proposes to pay the car off in 54 months. (The Court's estimate of $175 per month in depreciation would mean that the collateral would become worthless in 40 months, which

would mean that the collateral would be valueless 14 months prior to payoff.) But it should be remembered that the Court assigned a depreciation figure at the very low end of the testimony, notwithstanding the testimony about the Debtors putting higher than average mileage on the vehicle. The vehicle is currently 6 years old and has 108,000 miles on the odometer. At 2,300 miles per month, in 30 months the car will be 9 years old and have 177,000 miles on the odometer. It is not unreasonable to conclude that the car will be relatively worthless at that time.

## THE PARTIES' CONTENTIONS

McGinnis contends that it is entitled to be adequately protected against the decline in value of its collateral, and that a promise of payment in the plan is not adequate protection. The Debtors contend that so long as the plan proposes to pay the entire debt, and so long as the vehicle is insured, the creditor is adequately protected and relief from the stay is not appropriate.[5]

## LEGAL ANALYSIS AND CONCLUSIONS

Bankruptcy Code § 362(a) provides that the filing of a bankruptcy case automatically stays creditor collection effort. Subsection (d) provides that

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest . . .

Bankruptcy Code § 361 provides:

When adequate protection is required . . . such adequate protection may be provided by . . . requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay . . . results in a decrease in the value of such entity's interest in such property . . . .

The legislative history to § 361 states:

This section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for . . . The first method of adequate protection specified is periodic cash payments by the estate, to the extent of a decrease in value of the opposing entity's interest in the property involved . . . The use of periodic payments may be appropriate, where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation.

■ As noted above, the Debtors contend that the promise of payments in the chapter 13 plan is adequate protection. In its memorandum of authorities, McGinnis cited the classic statement of Judge Learned Hand for the proposition that a promise of payment is not adequate protection. In interpreting a predecessor of the Bankruptcy Code, Judge Learned Hand wrote:

It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of the junior hold-

---

5. McGinnis filed a memorandum of authorities (doc # 18). The Debtors did not. The Court has characterized the oral argument of Debtors' counsel and Debtors' pleadings.

er, unless by a substitute of the most indubitable equivalence ... *In re Murel Holding Corporation,* 75 F.2d 941, 942 (2nd Cir.1935).

In the seminal Supreme Court decision interpreting §§ 361 and 362 of the Bankruptcy Code, Justice Scalia wrote:

Interest is not adequately protected if the security is depreciating during the term of the stay. If the apartment project in this case had been declining in value petitioner would have been entitled, under § 362(d)(1) to cash payments or additional security in the amount of the decline as § 361 describes. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.* 484 U.S. 365, 370, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The Court has been cited to no authority for the proposition advanced by Debtors' counsel, *i.e.* that the mere promise to pay, incorporated into a chapter 13 plan that has not yet been confirmed is adequate protection of the decline in value resulting from depreciation. The Court has found no such authority in its own research.

■ Therefore, the Court concludes that the stay must lift unless the creditor is provided with adequate protection of its interest in the collateral, which the Court concludes in this case requires periodic payments at least equal to the depreciation of the collateral. In this case, that means payments of $175.00 per month.[6]

Neither party has adequately addressed when the adequate protection payments must begin. The Court has found a divergence in the jurisprudence. Some courts hold that adequate protection must be provided from the first day of the case, while others conclude that the payments are not required until the motion to lift stay is filed. Either position can be defended on technical legal grounds.[7] In this case, the Court will not address the issue because the difference is *de minimis.* The motion to lift stay was filed one month into the case. The Court will order adequate protection beginning at the end of the second month. In addition, since this is a matter of first impression in the Southern District, the Court will allow a period of time for the Debtors to adjust their payments and to enter into interim distribution orders, if necessary, to comply with this order.

The Court has not yet been asked to determine the effect of plan confirmation. *Till v. SCS Credit Corp.* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) instructs bankruptcy judges to pay strict attention to feasibility of a chapter 13 plan. Taking that admonition seriously, knowing that 70% of chapter 13 plans are dismissed or converted prior to plan consummation, and trying to read § 1325(a)(4) in harmony with §§ 361 and 362(d)(1), the Court would be hard pressed to confirm a plan that did not make payments in sufficient amount and timely to protect the secured lender from the possibility, at any point in time,

6. For reasons explained in the preceding footnote, payments post-confirmation would probably be higher, since the debt must be paid prior to the date that the vehicle becomes worthless.

7. It would be truly unfortunate as a matter of policy to hold that the right to adequate protection did not arise until a motion to lift stay was filed. That would encourage litigation, clog the courts' dockets, and result in unnec-

essary expense for both creditors and the debtor. Motions to lift stay cost $150 merely as a filing fee. Attorneys fees and reimbursable expenses (considering attorneys for the debtor and attorneys for the creditor and the expenses of noticing the motion *etc.*) frequently exceed $1,000. Requiring a creditor to file a motion to lift stay in order to get adequate protection would provide no benefit to anyone and would be costly to all parties.

that the collateral will be worth less than the amount due to the secured creditor under the plan. The potential for abuse under any other interpretation of the statute is obvious. The potential is illustrated by the increasing litigation over plan modifications that propose to surrender fully depreciated collateral after confirmation of a chapter 13 plan. It is not unusual for debtors to propose a plan modification to surrender vehicles that have become worthless; the jurisprudence is split over whether such a modification can be approved, whether the debtor can be required to pay the entire secured claim over the remainder of the plan, and whether the secured lender gets a priority claim that might require disgorgement of priority claim payments: *see* § 507(b), *and see* discussion in *In re Hernandez* 282 B.R. 200, 203 (Bankr.S.D.Tex.2002) Bankr."The Parade of Horribles." Requiring a plan to make payments to the creditor that keep the vehicle loan from becoming "upside down" (*i.e.* the loan balance exceeds the value of the vehicle) avoids all these problems.

### CONCLUSION AND ORDER

IT IS ORDERED THAT the automatic stay will remain in place in this case conditional on the Debtors compliance with the following requirements:

1. Not later than October 31, 2004, the Debtors must make a payment to McGinnis in the amount of $175.00 and the Debtors must make an equal payment at the end of each month thereafter until the plan is confirmed. Not later than November 30, 2004, the Debtors shall pay McGinnis $350.00 (payments for August and September, 2004.) These payments may be made directly or through an interim distribution order with the chapter 13 trustee.

2. The Court will not rule now on the requirements for timing of payments to McGinnis under the plan. Although as noted above, the Court's preliminary view is that reading the various statutory provisions in harmony and in consideration of the admonition in *Till* would require payments to McGinnis that are at least sufficient to prevent the amount due McGinnis under the plan from exceeding the value of the collateral. Either of the parties may raise this issue and brief it at the confirmation hearing.

3. The Debtors must keep collision and comprehensive insurance in force on the vehicle throughout the case, in an amount at least equal to the balance due McGinnis under the plan at any given time.